**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. Small Business Administration as Receiver of ELK ASSOCIATES FUNDING CORP. | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| AMERITRANS HOLDINGS LLC, BOUNTY INVESTMENTS, LLC, RENOVA U.S. MANAGEMENT, LLC N/K/A SPARROW CAPITAL HOLDINGS LLC, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Civil Case No.

RELATED TO
CIV. NO. 13-1326-JS

## ORIGINAL COMPLAINT

COMES NOW, Plaintiff, Elk Associates Funding Corporation ("Elk"), by and through its court-appointed receiver (the "Receiver"), the U.S. Small Business Administration ("SBA"), and hereby brings its Original Complaint against Ameritrans Holdings, LLC ("A Holdings"), Bounty Investments, LLC ("Bounty") and Renova U.S. Management, LLC which is now known as Sparrow Capital Holdings, LLC and upon information and belief is doing business as Columbus Nova ("Renova"), which upon information and belief received funds in excess of $1.42 million, which funds had been improperly diverted to Ameritrans Capital Corporation ("Ameritrans") from the sale of Elk's assets  and paid by Ameritrans to the above-named Defendants.  A Holdings was a special purpose entity created by Bounty and/or Renova to facilitate the transaction between Bounty and/or Renova and Ameritrans.  Upon information and belief, A Holdings is 100% owned by Bounty and managed by Renova.  The Receiver alleges as follows:

## NATURE OF THE ACTION

1.      The U.S. Small Business Administration brings this action in its capacity as court-appointed Receiver of Elk, and on behalf of the receivership estate of Elk against the

Defendants for moneys had and received, equitable clawback, unjust enrichment, and constructive trust to recover the funds that were improperly diverted from the sale of Elk's assets to Ameritrans and paid to A Holdings in satisfaction of debts of Ameritrans, and which funds were upon information and belief transferred to Bounty and/or Renova.

2.      On June 4, 2019, the Receiver obtained an order from this Court in the Receivership Action lifting the stay and injunction imposed by the Receivership Order for the limited purpose of authorizing the Receiver to bring this action.

## PARTIES

3.      Plaintiff Elk is a New York corporation in receivership pursuant to the Receivership Order which appointed SBA as liquidating receiver of Elk. Elk is, and was at all times, a small business investment company ("SBIC") whose parent company and sole shareholder is Ameritrans. At all relevant times, Elk and Ameritrans had the same officers and directors and shared the same office space in New York. As the 100% owner of Elk's common stock, Ameritrans is an Associate of Elk, as the term *Associate* is defined at 13 C.F.R §107.50(2).

4.      Defendant Ameritrans Holdings, LLC, is a special purpose entity formed upon information and belief by Bounty and/or Renova for the transaction with Ameritrans described herein. A Holdings is a Delaware limited liability company, with an address at 900 Third Avenue, 19th Floor, New York, New York 10022.

5.      Defendant Bounty Investments, LLC is a Delaware limited liability company, with registered service address Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware, 19808. Upon information and belief, Bounty is the 100% owner of A Holdings, creating A Holdings for the transaction herein with Ameritrans, and provided bridge financing to Ameritrans in January 2011 through A Holdings.

6.      Renova U.S. Management LLC is now known as Sparrow Capital Holdings LLC, and is upon information and belief doing business as Columbus Nova.  Renova U.S. Management LLC is a Delaware limited liability company, with a service of process address at c/o Corporation Service Company, 80 State Street, Albany, New York 12207.  Upon information and belief, Renova is doing business as Columbus Nova, and was referred to as "Columbus Nova" during this transaction, with an address at 900 Third Avenue, 19th Floor, New York, New York 10022 and Chief Executive Officer Andrew Intrater.

## JURISDICTION

7.      This action arises under 15 U.S.C. § 687c, the Small Business Investment Act of 1958 (the "Act") as implemented by 13 CFR Part 107 (the "Regulations") and related state statutes. This Court has jurisdiction over this action pursuant to the Receivership Order, 28 U.S.C § 1331, 15 U.S.C. §§ 687c and 687h, 28 U.S.C. §§ 754, 1692 and 1367.  The causes of action which arise under the laws of the State of New York are pendent or ancillary causes under 28 U.S.C. § 1367 to the Receivership Action.

## VENUE

8.      Venue is proper pursuant to 28 U.S.C. § 754 as this action is ancillary to this Court's exclusive jurisdiction over Elk pursuant to 15 USC 687c.

## FACTS

## ELK – A Small Business Investment Company

9.      SBA administers a program known as the Small Business Investment Company Program pursuant to the Act, 15 U.S.C. §661 et seq.  This program is designed to stimulate the U.S. economy by promoting small businesses which need, but which may otherwise be unable to obtain, financing.  SBA licenses private investment firms, known as

SBICs, to provide financing to qualified Small Businesses. Once licensed by SBA, an SBIC can receive federal matching funds known as "Leverage".

10.     On or about July 24, 1980, Elk was licensed by SBA as a Small Business Investment Company ("SBIC") pursuant to Section 301(d) of the Act, 15 U.S.C. §681(d) and later Section 301(c) of the Act, as SBA License 02/02-5377, to do business under the provisions of the Act and the Regulations.

11.     Section 303 of the Act, 15 U.S.C. §683, authorizes SBA to provide financing to licensed SBICs.  Pursuant to Section 303 of the Act, 15 U.S.C. §683, SBA provided funds to Elk through the purchase and/or guaranty of Debentures, a form of Leverage, as those terms are defined under the Regulations.

12.     Once licensed, an SBIC may seek a "Leverage Commitment" of federal money from SBA. *See* 13 C.F.R. § 107.1100 *et seq.* An SBIC may obtain a federal Leverage Commitment of up to twice its paid-in private capital.  To be eligible for Leverage and to obtain a commitment from SBA to issue Leverage, an SBIC must be in compliance with the SBIC Regulations. 13 C.F.R. § 107.1120(i).  Once a commitment has been obtained, the SBIC obtains funds from its Leverage Commitment through a series of "draws."

13.     13 C.F.R. §107.730 prohibits an SBIC from providing financing which constitute conflicts of interest, including providing financing to any of the SBIC's Associates. 13 C.F.R. §107.50 defines an Associate of an SBIC to include:1) Any Person who owns or controls, or who has entered into an agreement to own or control, directly or indirectly, at least 10 percent of any class of stock of a Corporate Licensee.  "Person" is defined as a natural person or legal entity.

14.     In connection with the issuance of an SBA-guaranteed debenture Elk and SBA

entered into a security agreement dated September 9, 1993 (the "SBA Security Agreement") pursuant to which Elk granted a security interest to SBA in all of Elk's assets, including among other things, Elk's portfolio of loans receivable, together with any guarantees thereon, and all other obligations owing to Elk, to secure payment of Debentures and any other indebtedness or liability of Elk to SBA, including future debentures which may be issued to or guaranteed by SBA.

15.    On September 9, 1993, Elk and SBA also entered into an agreement (the "SBA Agreement"), wherein Elk agreed to execute: (i) a security agreement in favor of SBA; (ii) Form UCC-1 Financing Statements in favor of SBA; (iii) an intercreditor agreement (the "Intercreditor Agreement"); and (iv) a custodian agreement ("the Custodian Agreement") pursuant to which Israel Discount Bank was appointed custodian ("the Custodian Bank") to hold all of Elk's assets for the benefit of Elk's bank lenders and SBA (collectively, the "Lenders"). The bank lenders were later removed leaving only SBA.

16.    In 1998, SBA consented to a shareholder change whereby Ameritrans a publicly traded company, would be the sole shareholder of Elk, based on certain conditions including that Elk's assets could not be used to collateralize any indebtedness of Ameritrans. At all times relevant, Elk and Ameritrans had the same officers and directors and shared the same office space in New York. As the 100% owner of Elk's common stock, Ameritrans is an Associate of Elk, as the term *Associate* is defined at 13 C.F.R §107.50(2).

17.    In 1998 and again in 1999, Elk confirmed that "Elk's management is aware of the fact that the Licensee's [Elk] assets cannot be used to collateralize any indebtedness of Ameritrans."

18.    According to the records of the New York Secretary of State, on August 13,

2007, a form UCC-1 Financing Statement was filed in favor of SBA which was subject to the rights of Elk's Senior Lenders; however, between March 22, 2011 and March 24, 2011, Elk's Senior Lenders UCC-1 Financing Statements were terminated, leaving only the Form UCC-1 Financing Statement in favor of SBA which was active to August 13, 2012.

19.    Prior to December 2008, Elk received debenture funding from SBA in the amount of approximately $11,600,000, which gave rise to the filing of the UCC-1 in favor of SBA mentioned in Paragraph 19 above. Elk's and SBA's records indicate that by letter dated December 18, 2008, Elk requested an additional $15 million commitment from SBA. In the letter, Elk, controlled by the same persons who controlled Ameritrans, certified that "the proceeds of the issuance and sale of the securities to be committed by SBA as requested herein will be used only for the purposes contemplated by the Act and the Regulations." (emphasis in original).

20.    In September 2009, SBA approved a commitment of $9,175,000, which was taken by Elk in one draw in December 2009. The new commitment amount was in addition to the $11,600,000 in debenture funding Elk had received.

21.    Ameritrans as an entity regulated by the SEC is required to make certain filings with the SEC which are publicly available on the EDGAR website including 10-K, 10-Q, N-2, and Schedule 14A Form filings. Ameritrans SEC Form 10-K for the fiscal year ending June 30, 2010, states that Ameritrans had not operated at a profit "in recent years" and "anticipated incurring a loss in fiscal year 2011...." Ameritrans went on to report that it had a decline in revenue, down from $6.3 million in 2008 to $1.7 million in 2010.

22.    On or about July 13, 2010, SBA informed Elk that, based on Elk's March 31, 2010 financial report submitted to SBA, Elk had a condition of capital impairment, as that term

is defined at 13 C.F.R. §107.1830.  Consequently, Elk was in violation of Section 107.1820(f)(5).

23.    The condition of capital impairment has not been cured to date.  Currently, there remains approximately $19.5 million in unpaid and outstanding Debenture Leverage due from Elk to SBA.

**Short Term Loan from A Holdings**

24.    On November 19, 2010 Columbus Nova by its CEO Andrew Intrater, executed an agreement in connection with "consideration of a possible transaction…involving Ameritrans" with Daroth Capital Advisors LLC, an investment advisor retained by Ameritrans to help it raise capital.

25.    According to Ameritrans' SEC Form Schedule 14A dated May 23, 2011, on November 19, 2010, "Daroth introduced the Company [Ameritrans] to Columbus Nova.  Shortly thereafter, the Company [Ameritrans] management met with representatives of Columbus Nova and its legal counsel at Columbus Nova's offices."

26.    According to Ameritrans' SEC Form Schedule 14A dated May 23, 2011, Between December 15 and December 30, 2010, "the Company's [Ameritrans] management and Columbus Nova continued to negotiate a non-binding term sheet for a proposed investment in the Company [Ameritrans]…Columbus Nova requested that the Company [Ameritrans] agree to an exclusivity period for Columbus Nova's complete due diligence and negotiate definitive documentation for its proposed investment…[o]n December 17, 2010, Columbus Nova submitted a non-binding term sheet for an investment in the Company."

27.    According to Ameritrans' SEC Form Schedule 14A dated May 23, 2011, on or about December 17, 2010, "[t]he Company indicated to Columbus Nova that it required a

working capital investment and worked with Columbus Nova to negotiate a $5 million bridge loan."

28.     Based on information submitted by Elk in its SBA Form 468 for the period ending March 31, 2010, Elk was, and remains, capitally impaired as that term is defined in 13 C.F.R. 107.1830 (2010). As of December 31, 2010, Elk was insolvent.

29.     According to Ameritrans' SEC Form Schedule 14A dated May 23, 2011, on January 4, 2011, "Columbus Nova and the Company [Ameritrans] resumed discussions regarding a bridge loan, an exclusivity agreement and a non-binding term sheet for a larger investment."

30.     The January 18, 2011 minutes of a special meeting of the Board of Directors of Ameritrans and Elk set forth a discussion of "the anticipated Senior Note transaction with an affiliate of Columbus Nova" and "proposed exclusivity agreement to be entered into with Columbus Nova" where "CN [Columbus Nova] will purchase a minimum of $60 million in AMTC [Ameritrans] shares at $1.50 per share."

31.     According to Ameritrans' SEC Form Schedule 14A dated May 23, 2011, on January 19, 2011, "the Company [Ameritrans] entered into an exclusivity agreement with Bounty, an affiliate of Columbus Nova, and executed a bridge note in the principal amount of $1,500,000."

32.     According to Ameritrans's Daily Bank Accounts Balance Report dated January 19, 2011, Ameritrans's total bank accounts balance was overdrawn with aggregate bank accounts balances totaling negative $102,414.49, which increased to $1,397,585.61 on January 20, 2011, based on the receipt of the $1.5 million of funds on behalf of the A Holdings Note.

33.     On January 20, 2011, Ameritrans directed payment to Latham & Watkins LLP

for $100,000, A Holdings notice recipient under the A Holdings Note, which invoice directed payment to Columbus Nova Partners, LLC, 900 Third Avenue, 19th FL, New York, NY 10022.

34.    On January 20, 2011, Ameritrans issued a promissory note in the principal amount of $1,500,000 to, A Holdings, a special purpose entity which, upon information and belief, is 100% owned by defendant Bounty and created at the direction of Columbus Nova as a shell company for the sole purpose, of providing the bridge loan to Ameritrans evidenced by this note ("A Holdings Note").

35.    The A Holdings Note was originally secured by a pledge of 100% of the issued and outstanding shares of the common stock of Elk owned by Ameritrans, but such pledge was a violation of SBIC Regulations, so the A Holdings Note was amended in May 2011 to include all personal property and other assets of Ameritrans and to exclude the common stock and all other equity interests of Elk, as disclosed in Ameritrans's 10-K for the period ending June 30, 2011, at F23.

36.    The Chief Executive Officer of A Holdings is Andrew Intrater.

37.    A Holdings and Renova doing business as Columbus Nova share the same CEO, office and address.

38.    Upon information and belief, A Holdings is owned by Bounty and is managed and/or an affiliate of Renova doing business as Columbus Nova.

39.    According to Ameritrans' SEC Form Schedule 14A dated May 23, 2011, from January 20, 2011 through February 28, 2011, "the Company [Ameritrans] negotiated exclusively with Columbus Nova…[o]n February 28, 2011, the exclusivity period with Columbus Nova was automatically extended to March 10, 2011, pursuant to the terms of the exclusivity agreement."

40.    Elk was not a party to, or guarantor of, the A Holdings loan or note and had no

obligation to pay the A Holdings Note, and, in fact, payment by Elk or use of Elk's assets was prohibited pursuant to 13 CFR §107.730(4), which prohibits an SBIC from providing financing to discharge an obligation of its Associate (i.e. Ameritrans), pursuant to 13 CFR §107.730(1).

**Terms of the A Holdings Note and SEC Filings the Note References**

41.     The A Holdings Note at section 4.1(1) states "use of proceeds of this Note solely (i) to pay certain transaction expenses of the Holder and the Company [Ameritrans] as contemplated in Section 4.1(g) and (ii) for general working capital purposes."  The makers of the A Holdings Note required that the use of the proceeds of the A Holdings Note be used solely as described above.

42.     Defendants were on notice that the proceeds of the A Holdings Note were solely to be used to pay transaction expenses and to act as general working capital of Ameritrans.

43.     The $1,500,000 short term loan from A Holdings paid to Ameritrans for the benefit of Ameritrans was used by Ameritrans for Ameritrans expenses, to pay Ameritrans life insurance premiums, and to purchase and/or maintain non-SBIC assets belonging to Ameritrans.

44.     According to Elk's cash receipts ledgers and bank accounts records, the proceeds of the $1,500,000 loan from A Holdings to Ameritrans were not paid to, deposited into any of Elk's accounts nor otherwise used for the benefit of Elk.

45.     The A Holdings Note stated at paragraph 3.6 "[t]he Company's [Ameritrans] consolidated statements of assets and liabilities, consolidated statements of operations, consolidated statements of changes in net assets, consolidated statements of cash flows and consolidated statements of investments set forth in the Company's [Ameritrans] annual report on Form 10-K for the fiscal year ended June 30, 2010 and quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2010, in each case as filed with the SEC, present fairly, in all

material respects, the consolidated financial position of the Company [Ameritrans] as of the dates set forth therein, and the results of their operations and their cash flows for each of the fiscal periods set forth therein, in conformity with accounting principles generally accepted in the United States of America."

46.    A Holdings was on notice of Ameritrans's financial condition as contained in Ameritrans annual report Form 10-K and 10-Q.

47.    On or about July 13, 2010, SBA informed Elk that, based on Elk's March 31, 2010 financial report submitted to SBA, Elk had a condition of capital impairment, as that term is defined at 13 C.F.R. §107.1830. Consequently, Elk was in violation of Section 107.1820(f)(5). Ameritrans SEC Form 10-Q for the fiscal quarter ended September 30, 2010 states that "Elk had a condition of capital impairment as of September 30, 2010."

48.    A Holdings was on notice of Elk's capital impairment.

49.    The A Holdings Note stated at paragraph 3.4 "[a]s of the date first set forth above, neither the Company nor its Subsidiaries has any Indebtedness for borrowed money other than (i) as represented by this Note and (ii) all other Indebtedness set forth in Schedule I attached hereto.

50.    The A Holdings Note Schedule 1 lists existing indebtedness of "1. $3.0 million principal amount of indebtedness under the Existing Promissory Notes, 2. $21.175 million principal amount of indebtedness under of debentures issued to SBA, and 3. $119,000 principal amount of indebtedness owed to Signature Bank."

51.    The SEC Form 10-Q for the fiscal quarter ended September 30, 2010, referenced in the A Holding Note, states "[a]t September 30, 2010, approximately 86% of the Company's indebtedness was due to debentures issued to the SBA with fixed rates of interest

plus user fees …the Company had available $452,000 of credit lines from its banks, of which $0 was drawn down as of that date, subject to the statutory and regulatory limitations imposed by the SBA" and stated that outstanding debentures of $21,175,000 are payable to the SBA.

52.    A Holdings was aware of the $21.75 million in indebtedness owed by Elk under debentures issued to SBA and that Elk was capitally impaired as defined by the SBIC Regulations.

53.    The A Holdings Note stated at paragraph 3.5 that "[t]he Company [Ameritrans] has obtained any required approvals from any governmental entity…. for the execution and performance of its obligations under this Note (including without limitation any approvals required pursuant to the Investment Company Act or the [Small Business Investment Act of 1958, as amended]."

54.    The A Holdings Note stated at paragraph 4.1 (h) the Company would use "commercially reasonable best efforts to cause Elk at all times to be registered and in good standing as a small business investment company and to be in compliance with the rules and regulations of the Small Business Administration applicable to small business investment companies except for such non-compliance described in the Company's annual report on Form 401K 10-K for the fiscal year ended June 30, 2010 and/or quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2010."

55.    A Holdings was on notice that Elk was an SBIC governed by the rules and regulations of the Small Business Investment Act of 1958.

56.    The A Holdings Note stated at paragraph 4.1 (k) in the event that Elk sells any assets, the Company [Ameritrans] shall cause Elk to reinvest the proceeds of such sale in assets in a manner consistent with the Company's [Ameritrans] existing plan as described in the

Company's [Ameritrans] annual report on Form 10-K for the fiscal year ended June 30, 2010 and/or quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2010...."

57.     The SBA Security Agreement required that any proceeds be paid over to SBA unless prior approval was obtained by SBA for Elk to use the funds otherwise.

58.     The Defendants were on notice that the proceeds of the sale of any of Elk's assets must be reinvested in Elk, and SBA had a priority security interest to Elk's assets as evidenced by the form UCC-1 Financing Statement filed on August 13, 2007 in favor of SBA.

59.     The Ameritrans 10-K filing for the fiscal year ended June 30, 2010, explicitly referenced in the A Holdings Note, states "Ameritrans was organized to be the sole shareholder of Elk and to make loans and investments that Elk may not be permitted to make under SBA regulations...Elk was organized primarily to provide long-term loans to businesses eligible for investments ("Small Business Concerns") by small business investment companies ("SBICs") under the U.S. Small Business Investment Act of 1958 (the "1958 Act"). Elk makes loans for financing diversified businesses that qualify for funding under SBA Regulations."

60.     The Ameritrans 10-K filing for the fiscal year ended June 30, 2010, explicitly referenced in the A Holdings Note, states "SBICs must invest funds that are not being used to make loans in investments permitted under SBA Regulations. These permitted investments include direct obligations of, or obligations guaranteed as to principal and interest by, the government of the United States with a term of 15 months or less and deposits maturing in one year or less issued by an institution insured by the FDIC."

61.     The Ameritrans 10-K filing for the fiscal year ended June 30, 2010, explicitly referenced in the A Holdings Note, states "[a]t June 30, 2010, we [Elk] had outstanding debentures payable to the SBA aggregating $21.175 million. As an SBIC we [Elk] must comply

with the rules and regulations of the SBA. Should we not be in compliance, we may not be eligible for additional financing and our loans may become immediately due and terminated."

62.     The Defendants were on notice of the restrictions of Elk's investment of funds and loan capabilities under SBA Regulations.

**The SBA Agreement, Intercreditor Agreement and Custodian Agreement**

63.     The Ameritrans Form 10-K for the fiscal year ended June 30, 2010, referenced in the A Holdings Note, acknowledged that "Elk is required to comply with certain provisions, covenants and conditions, and its loans receivable and other assets are pledged as collateral [to SBA]."  Further stating, "[p]ursuant to an agreement with SBA (the "SBA Agreement"), Elk agreed to limit the aggregate of its indebtedness based on a computation of a borrowing base (the "Borrowing Base") each quarter.  The borrowing base computation is calculated to determine that the total amount of debt due on senior bank debt and SBA debentures does not exceed approximately 80% of the value of performing loans and investments in Elk's portfolio…As of June 30, 2010, Elk was not in compliance with the Borrowing Base."

64.     The SEC Form 10-Q for the fiscal quarter ended September 30, 2010, referenced in the A Holding Note, states that "The Company [Ameritrans] has pledged its loans receivable and all other assets as collateral for the above lines of credit. Pursuant to the SBA agreement and an "intercreditor agreement" among the lending banks and the SBA…In accordance with the loan documentation with the SBA and the banks, the Company must also comply with maintaining overall debt levels within a formula based upon the performance of its loan portfolio according to an SBA formula "borrowing base," which is submitted for review to the SBA and the banks for periodic review."

65.    The Ameritrans Form 10-K for the fiscal year ended June 30, 2010, referenced in the A Holdings Note, states "[i]n connection with the SBA Agreement, Elk has also entered into an intercreditor agreement (the "Intercreditor Agreement") and a custodian agreement (the "Custodian Agreement") with its banks and the SBA. Pursuant to the Custodian Agreement, the banks and the SBA appointed Israel Discount Bank of New York as the custodian to hold certain notes, security agreements, financing statements, assignments of financing statements, and other instruments and securities as part of the collateral for Elk's indebtedness to the banks and the SBA…. Pursuant to the Intercreditor Agreement, the banks consented to the grant by Elk to the SBA of a security interest in the collateral…."

66.    The Custodian Agreement between Elk and SBA required at paragraph 5(a), "[i]n the event [Elk] intends to sell all or a portion of [Elk's] interest in any note or other evidence of indebtedness, including but not limited to any participation interest proposed to be sold by [Elk], such sale may be made by [Elk] in its sole discretion…so long as [Elk] provides the Custodian with a written certification that the net proceeds from such sale will be utilized immediately to reduce [Elk's] Senior Indebtedness and the proceeds are so utilized; provided further, however, in the event [Elk] does not intend to utilize the proceeds to repay the Senior Indebtedness, it will notify SBA, the Banks and the Custodian in writing…of the proposed sale…."

67.    The Ameritrans 10-K filing for the fiscal year ended June 30, 2010 incorporated by reference at exhibit 10.1 the Security Agreement between Elk and the SBA, dated September 9, 1993, at 10.5 the Custodian Agreement among Elk, the Bank Lenders, the SBA, and Israel Discount Bank of New York as Custodian, dated September 9, 1993, at 10.6 the SBA Agreement between Elk and SBA, at 10.7 the Intercreditor Agreement among Elk, the

Senior Lenders and SBA dated September 9, 1993 and at 10.8 the Amendments to the Custodian and Intercreditor Agreements.

68.     The Defendants were on notice of the terms of the SBA Agreement, Custodian Agreement, and Intercreditor Agreement.

69.     The A Holdings Note stated at paragraph 4.2 <u>Negative Covenants</u>.  From the date hereof until all principal and interest owning hereunder have been paid in full the Company shall not, and in the case of clauses (a) through (d), the Company [Ameritrans] shall not permit any of its Subsidiaries [Elk] to, do or take any action on or following the date hereof with respect to any of the following: (a) cease to conduct or carry on the business of the Company or its Subsidiaries substantially as now conducted or as proposed to be conducted or materially change any part of its business activities or take any action which would result in a Material Adverse Effect; (b) effect the sale, transfer or license, in a single transaction or a series of transactions, of any material assets with a fair market value in excess of $500,000;…(f) repay any amount of principal in respect of the Existing Promissory Notes; (g) incur any Indebtedness for borrowed money in excess of $250,000; (h) incur any Liens other than Permitted Liens;…."

70.     The A Holdings Note stated at Article 7 defines a "'Material Adverse Effect' means any event or series of events that, individually or in the aggregate, results in a material adverse change in, or a material adverse effect upon, the operations, business, properties or condition (financial or otherwise) of Borrower or any Subsidiary of Borrower."

71.     On February 28, 2011, the exclusivity period with Columbus Nova was automatically extended to March 10, 2011, pursuant to the terms of the exclusivity agreement.

72.     According to Ameritrans' SEC Form Schedule 14A dated May 23, 2011, on March 23, 2011, the "Board then held a discussion on the issues presented and the need for the

Company [Ameritrans], under current circumstances, to consummate an equity investment such as the proposed investment being negotiated with CN [Columbus Nova]. The Board then directed management to continue negotiating with CN [Columbus Nova] and to make efforts to resolve open issues."

73.     In April of 2011, an Amendment to the Secured Note dated January 19, 2011, was entered into by and between Ameritrans and A Holdings, to allow Ameritrans to incur certain indebtedness including to delete Section 4.2(g) of the Note and replace that provision with "(g) incur any indebtedness for borrowed money in excess of $250,000 other than indebtedness incurred in the ordinary course of business consistent with past practices for use as working capital in an aggregate principal amount not to exceed $500,000." The Amendment was executed by A Holdings and Andrew Intrater.

**The Stock Purchase Agreement**

74.     According to Ameritrans' SEC Form Schedule 14A dated May 23, 2011, on April 11, 2011, at a meeting of Ameritrans's Board of Directors, a "representative of Katten Muchin Rosenman LLP then summarized the principal terms of the proposed stock purchase agreement with Renova US Holdings Ltd. ("**Renova**", i.e., the Purchaser under the Purchase Agreement), an affiliate of CN [Columbus Nova], and answered various questions regarding said terms posed by Board members....A representative of Richards, Layton & Finger, P.A. reviewed with the Board its fiduciary duties in connection with its consideration of the CN/Renova transaction..."

75.     Upon information and belief, A Holdings, Renova, Columbus Nova and Renova US Holdings Ltd. share the same office and address.

76.     Upon information and belief, Sparrow Capital Holdings LLC was formerly

known as Renova U.S. Management LLC and is doing business as Columbus Nova.

77.    Upon information and belief Renova US Holdings Ltd. and Renova US Management LLC are affiliated entities.

78.    On April 12, 2011, Ameritrans entered into a Stock Purchase Agreement with Renova US Holdings Ltd., which would result in Renova US Holdings Ltd. owning 91.4% of the issued and outstanding common stock of Ameritrans.

79.    The April 12, 2011 Stock Purchase Agreement at Section 5.2(h) the Company Forbearances section expressly referred to the A Holdings Note.

80.    The April 12, 2011 Stock Purchase Agreement at Section 5.3 provided reasonable access to Ameritrans company records and directed Renova US Holdings Ltd. to the SEC's EDGAR website, include Ameritrans 10-K, 10-Q and N-2 filings.

81.    Upon information and belief, Ameritrans periodically provided financial statements, workpapers and other agreements and documents important to its operations to Renova via emails, as required in the A Holdings Note, Stock Purchase Agreement or other related agreements.

82.    The April 12, 2011 Stock Purchase Agreement at Section 5.4 Use of Proceeds. "The cash proceeds of the issuance of and sale of the Purchased Stock shall be used (a) first, to pay the fees and expenses of the Company [Ameritrans] and the Purchaser [Renova US Holdings Ltd.] in connection with the negotiation and execution of this Agreement and the Transaction Agreements, (b) second, to repay the Senior Secured Note [A Holdings Note], dated January 19, 2011, issued by the Company [Ameritrans] to the Purchaser [Renova US Holdings Ltd.], (c) third, for general working capital and (d) fourth, to fund an equity investment in Elk Associates Funding Corporation."

83.     Therefore, the Stock Purchase Agreement by the foregoing quotation required Renova US Holdings Ltd. to receive the funds to pay off the A Holdings Note.

84.     The Stock Purchase Agreement stated that the purchaser's address was Renova US Holdings Ltd. c/o Columbus Nova, 900 3rd Avenue, 19th Floor, NY, NY, Attn: Paul Lipari.

85.     Ameritrans's SEC Proxy Statement Pursuant to Section 14(A) of the Securities Exchange Act of 1934 dated May 23, 2011 referred to Bounty as an affiliate of Columbus Nova, and Renova US Holdings Ld. as an affiliate of Columbus Nova and A Holdings.

86.     Pursuant to 17 C.F.R. 230.405 Definitions of terms, defines affiliate as "an affiliate of, or person affiliated with, a specified person, is a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified."  An associate is defined as "[t]he term associate, when used to indicate a relationship with any person, means (1) a corporation or organization (other than the registrant or a majority-owned subsidiary of the registrant) of which such person is an officer or partner or is, directly or indirectly, the beneficial owner of 10 percent or more of any class of equity securities, (2) any trust or other estate in which such person serves as trustee or in a similar capacity, and (3) any relative or spouse of such person, or any relative of such spouse, who has the same home as such person or who is a director or officer of the registrant or any of its parents or subsidiaries."

87.     Upon information and belief, defendant A Holdings is an affiliate of Bounty, and Renova as that term is defined in 17 C.F.R. 230.405.

88.     Upon information and belief, defendant Bounty is an affiliate of A Holdings and Renova as that term is defined in 17 C.F.R. 230.405.

89.     Consummation of the closing was subject to "the approval of the Small

Business Administration (the "SBA") of the indirect change of control of Elk Associates

Funding Corporation, a wholly owned subsidiary of the Company [Ameritrans]."

Consummation of each Subsequent Closing was subject to "Elk having remained in good

standing with SBA, in substantial compliance with the applicable rules and regulations and

eligible to receive leverage commitments under normal requirements and conditions."

90.      A Press Release filed as Exhibit 99.1 to Ameritrans U.S. SEC Form 8K Report

dated April 12, 2011, stated that "Andrew Intrater, Chief Executive Officer of Columbus Nova,

said, 'This new partnership not only cures the existing capital issues for Ameritrans, but it will

also put the Company [Ameritrans] on a trajectory for growth and profitability.  The Company

[Ameritrans] can now get back to the business of lending to companies poised to grow as the

economy recovers.'

91.      By email dated April 15, 2011 Paul Lipari of Columbus Nova agreed to

eliminate the Ameritrans stock pledge of Ameritrans stock ownership of Elk securing the A

Holdings Note and replacing the stock pledge with a negative pledge.

92.      Between May and July of 2011, Ameritrans and Columbus Nova

communicated and jointly created PowerPoint presentations and participated in at least one site

visit to SBA in Washington, DC to present the terms of the Stock Purchase Agreement to the

SBA.

93.      By letter dated December 22, 2011, SBA denied Elk's proposal that

Ameritrans complete the Stock Purchase Agreement because the transaction did not meet the

regulatory requirements for change of control under the SBIC Regulations.

94.      By email dated January 19, 2012, Paul Lipari, a partner of Columbus Nova,

notified Michael Feinsod ("Feinsod") CEO and director of Ameritrans and Elk, that since SBA

did not intend to approve a transaction between Ameritrans and Columbus Nova, Columbus Nova was exercising its rights under the A Holdings Note with attached written notice of default under the A Holdings Note.

95.     On January 19, 2012, A Holdings delivered written notice signed by Andrew Intrater to Ameritrans that an event of default under the $1.5 million A Holdings Note had occurred and declared all amounts immediately due and payable.

96.     According to Ameritrans's Daily Bank Accounts Balance Report dated January 20, 2012, Ameritrans's total bank accounts balance was $15,417.48.

97.     On February 23, 2012, Ameritrans director Ivan J. Wolpert sent an email to Paul Lipari of Columbus Nova, with a cc to Andrew Intrater CEO of Columbus Nova, and Michael Feinsod CEO of Ameritrans, stating "Ameritrans will pay you $1,420,000 on March 7th, in full satisfaction of all obligations between CN [Columbus Nova] and AMTC [Ameritrans]."

98.     On February 24, 2012, Elk was informed via telephone by SBA that Elk was being transferred to the Office of Liquidation due to Elk's condition of capital impairment, as defined at 13 C.F.R. §107.1830.  SBA's telephone call of February 24, 2012 was memorialized via a letter from SBA dated March 6, 2012 which stated "[t]he Licensee is hereby directed to cure its condition of Capital Impairment to SBA's satisfaction within 15 days from the date of this letter."

99.     The Custodian Agreement between Elk and SBA required at paragraph 5 (a), "[i]n the event [Elk] intends to sell all or a portion of [Elk's] interest in any note or other evidence of indebtedness, including but not limited to any participation interest proposed to be sold by [Elk], such sale may be made by [Elk] in its sole discretion…so long as [Elk]  provides the Custodian with a written certification that the net proceeds from such sale will be utilized

immediately to reduce [Elk's] Senior Indebtedness and the proceeds are so utilized; provided further, however, in the event [Elk] does not intend to utilize the proceeds to repay the Senior Indebtedness, it will notify SBA, the Banks and the Custodian in writing…of the proposed sale…."

**The Diversion of Funds from Elk to A Holdings, Bounty and Columbus Nova**

100.    By email dated March 2, 2012, Silvia Mullens ("Mullens"), an officer of Elk and Ameritrans instructed Jefferies High Yield Trading, LLC, that approximately $2.7 million received from the sale of Elk's investments in two (2) portfolio concerns, Affinity Group, Inc. and Miramax Film NY, LLC, be wired to Elk's checking account at Signature Bank and not the Custodian Bank.

101.    On March 6, 2012, Ameritrans's Daily Bank Account Balances report shows Ameritrans's total cash balance was $13,961.13.

102.    On March 7, 2012, $2.5 million was transferred from Elk's non-custodian account to Ameritrans's account. The required notice to SBA and the Custodian under the Custodian Agreement were not provided.

103.    By email dated March 7, 2012, Feinsod instructed Mullens and Dominic Granito ("Granito"), Controller of Elk and Ameritrans, to prepare a wire from Ameritrans to A Holdings in the amount of $1.42 million.  The funds transfer request was then executed to address 900 3rd Avenue, 19th Floor, NY, NY, and the transaction was confirmed by bank email that same day.  The transfer of funds occurred (a) without required notice to SBA, or to the Custodian, (b) without written approval from SBA, and (c) without deposit of proceeds of the sales of Elk's portfolio concerns into Elk's account at the Custodian Bank.

104.    The March 7, 2012 payoff letter between Ameritrans and A Holdings

referencing the $1,420,000 payment on March 7, 2012 was addressed to Ameritrans Holdings LLC, Columbus Nova, 900 3rd Avenue, 19th Floor, New York, New York, Attn: Paul Lipari, and signed by Ameritrans Holdings LLC, as Secured Party by Paul Lipari, title "partner".

105.    The transfers from Elk to Ameritrans and payments by Ameritrans to the Defendants totaling $1.42 million were made to the detriment of Elk and in violations of 1) 13 C.F.R. §107.885, which prohibits the disposition of assets to an Associate as that term is defined in 13 C.F.R §107.50, without prior written approval of SBA; and 2) 13 C.F.R § 107.730 (a)(4), which prohibits providing financing to a Small Business to discharge an obligation to an SBIC's Associate or to free other funds to pay such obligation, without the prior written approval of SBA.

106.    Ameritrans was an Associate of Elk as that term is defined in 13 C.F.R. §107.50(2).

107.    The $2.5 million was improperly diverted from Elk to Ameritrans on March 7, 2012, which included the $1.42 million transferred from Ameritrans to A Holdings, Ameritrans memorialized the transfer on March 9, 2012 by executing a "secured note" in the amount of $4,500,000 in favor of Elk.  The "secured note" was not secured.

**The Receivership of Elk**

108.    On March 20, 2012, one day prior to the March 21, 2012 expiration of SBA's deadline to cure Elk's violation of capital impairment, Elk filed for an emergency temporary restraining order against SBA in the United States District Court for District of Columbia to forestall SBA's transfer of Elk to the Office of Liquidation.

109.    After Elk failed to cure its condition of capital impairment, Elk was transferred to SBA's Office of Liquidation in April 2012.  By Order entered April 24, 2013 ("the

Receivership Order"), this Court appointed the U.S. Small Business Administration as Receiver (the "Receiver") of Elk under the provisions of 15 U.S.C. §687c and entered judgment in favor of SBA for the amount of Debentures outstanding, which at the time totaled over $20 million.

110.     By the Receivership Order entered April 24, 2013, this Court appointed the U.S. Small Business Administration as Receiver (the "Receiver") of Elk under the provisions of 15 U.S.C. §687c and entered judgment in favor of SBA for the amount of Debentures outstanding, which at the time totaled over $20 million.

111.     The Receiver was appointed for the primary purpose of liquidating all of Elk's assets and satisfying the claims of creditors in the order of priority as determined by this Court. Shortly after its appointment, the Receiver transferred the cash balance, totaling approximately $17,000, in Elk's account to the Receiver's trust account.

112.     Ameritrans SEC Form 10-K for the fiscal year ending June 30, 2012 states that Ameritrans had not operated at a profit "in recent years" and "anticipated incurring a loss in fiscal year 2013…."  Ameritrans went on to report that it had a decline in revenue from $6.3 million in 2008 to $2.1 million in 2012.

113.     At no time did Ameritrans have the funds or ability to repay Elk or the Defendants, as evidenced by Elk's Board Minutes and Ameritrans's Form 10-K filings with the SEC in 2011, which are a matter of public record.

114.     On October 5, 2016, Ameritrans filed for bankruptcy in the United States Bankruptcy Court for the District of Massachusetts.  On June 2, 2017, the Receiver filed an amended Proof of Claim in the amount of $14,271,038 in the Ameritrans bankruptcy matter.

115.     As disclosed in Elk's SBA Form 468 for the period ended December 31, 2011, Ameritrans owed Elk at least $5,124,413, with assets of less than $4 million according to

Ameritrans's Form 10-Q for the period ended December 31, 2011. Accordingly, Ameritrans' contemporaneous records indicate that it did not at any time have sufficient liquid or unencumbered funds or assets, to repay its debt to Elk and to Ameritrans creditors, including the A Holdings Note. Instead, Ameritrans used Elk's assets to repay Ameritrans's debts in violation of the SBIC Regulations and New York law to the detriment of Elk and its creditors. Ameritrans's contemporaneous records indicate that it did not at any time have funds or assets, or the reasonable likelihood of Ameritrans of obtaining any funds or assets, to repay its existing debt to Elk and to repay the A Holdings Note. Instead, Ameritrans improperly used its control of Elk to misdirect the proceeds from the sale of Elk's assets to repay Ameritrans's debts.

116.     Upon information and belief, A Holdings, Bounty and Renova benefited from the assets of Elk without any consideration to Elk, to the detriment of Elk.

117.     A Holdings, Bounty and Renova were on notice that Elk had a continuing condition of capital impairment since March 31, 2010 and Ameritrans had existing debt of $5,124,413.00 as of December 31, 2011 and did not have the funds to pay Elk and A Holdings.

118.     The Receiver for Elk hereby asserts claims for (a) moneys had and received; (b) equitable clawback; and (c) unjust enrichment seeking turnover of the funds and imposition of a constructive trust against each of the defendants individually and collectively and demands that the defendants turn over the $1.42 million of funds improperly diverted from Elk for Defendants' benefit, without consideration and to the detriment of Elk.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### FOR MONEY HAD AND RECEIVED

119.     Paragraphs 1 through 118 are re-alleged and reincorporated as though fully set forth herein.

120.      A Holdings, Bounty and Renova knew or should have known through the terms of the A Holdings Note, the Stock Purchase Agreement, and Ameritrans's SEC filings including its 10-Q, 10-K, N-2 and Schedule 14A forms that Ameritrans did not have sufficient unencumbered funds to pay Ameritrans creditors, including to pay the Defendants on behalf of the A Holdings Note.

121.      A Holdings, Bounty and Renova knew or should have known through the terms of A Holdings Note, the Stock Purchase Agreement, and Ameritrans's SEC filings including its 10-Q, 10-K and N-2 forms that Elk's funds could only be used as specified by the Act and Regulations, Elk was capitally impaired, and Elk's funds could not be used to pay Ameritrans's obligations to the Defendants on behalf of the A Holdings Note.

122.      Nevertheless, the funds from Elk's sales of two portfolio concerns Affinity Group, Inc. and Miramax Film NY, LLC, were not deposited with the Custodian in violation of the SBA Security Agreement and Custodian Agreement, SBA did not have notice and consequently, did not give the required written consent to the payment of the proceeds from the sale of Elk's assets to Ameritrans or to A Holdings, as set forth in paragraphs 64 through 73 and 100 through 107, which are re-alleged and reincorporated as though fully set forth in this cause of action.

123.      In addition to being a violation of the SBA Security Agreement, this transfer was in violation of 13 C.F.R. §107.885, which prohibits the disposition of assets to an Associate as that term is defined in 13 C.F.R. §107.50.

124.      On March 7, 2012, A Holdings, received $1.42 million of funds traced directly from the proceeds of Elk's sales of two portfolio concerns Affinity Group, Inc. and Miramax Film NY, LLC, which funds belong to Elk as described at paragraphs 100 through 107 which are

re-alleged and reincorporated as though fully set forth in this cause of action, and evidencing the element for moneys had and received, that A Holdings received money belonging to the Plaintiff.

125.    A Holdings and Renova doing business as Columbus Nova share the same CEO, office and address.

126.    Upon information and belief, A Holdings was a special purpose entity 100% owned by defendant Bounty and created at the direction of Renova as a shell company for the sole purpose, of providing the bridge loan to Ameritrans evidenced by the A Holdings Note.

127.    Upon information and belief, Elk's funds received by A Holdings, a shell company, were transferred to Defendant Renova doing business as Columbus Nova as the affiliate, principal and/or real party in interest of A Holdings and/or Bounty, A Holdings 100% owner, and evidencing the element for moneys had and received that Renova and/or Bounty received money belonging to the Plaintiff.

128.    Upon information and belief, A Holdings, Bounty and/or Renova benefited from receiving the $1.42 million of funds from the sales of Elk's assets to the detriment of Elk and its creditors, because on March 6, 2012, Ameritrans's total bank accounts balance was $13,961.13, and at the time of payment by Ameritrans to A Holdings on March 7, 2012, Ameritrans' records show that its total cash balance was comprised solely of the proceeds from the sales of Elk's assets, and evidencing the element of moneys had and received that the Defendants benefited from receipt of $1.42 million of Elk's money.

129.    Upon information and belief, A Holdings, Bounty, and/or Renova knew or should have known that Ameritrans did not have the funds to repay the A Holdings Note, that Elk was an SBIC subject to SBA regulations and that Ameritrans had insufficient unencumbered assets to pay Elk and A Holdings, as described at paragraphs 24 through 107, which are re-

alleged and reincorporated as if set forth in this cause of action, and evidencing the element of moneys had and received that under principles of equity and good conscience, the Defendants should not be permitted to keep Elk's money.

130.    The facts alleged in this cause of action show that A Holdings, Bounty, and Columbus Nova received $1.42 million of Elk's funds, benefited from receipt of the $1.42 million because Ameritrans did not have sufficient unencumbered funds to pay the A Holdings Note, and should not retain the funds under principles of equity and good conscience because the funds (a) belong to Elk, (b) were improperly diverted from Elk when Elk was capitally impaired and insolvent, and (c) were improperly diverted prior to Elk's transfer to the Office of Liquidation due to Elk's condition of capital impairment, as defined at 13 C.F.R. §107.1830, fulfilling the elements of moneys had and received.

131.    Based on the foregoing facts showing moneys had and received, the Defendants should not be permitted to retain and/or are liable to pay to the Receiver for Elk for not less than the amount of $1.42 million improperly diverted from Elk to A Holdings, and upon information and belief to Bounty and Renova, plus applicable interest thereon from March 7, 2012, the date of the improper transfer to the Defendants.

## SECOND CAUSE OF ACTION
## FOR CLAWBACK

132.    Paragraphs 1 through 131 are re-alleged and reincorporated as though fully set forth herein.

133.    Specifically, those paragraphs numbered 24 through 107 are re-alleged and reincorporated as though fully set forth herein.

134.    The Receiver was appointed for the purpose of marshaling and liquidating all of Elk's assets and satisfying the claims of creditors therefrom in the order of priority as

determined by the Court.

135.    The Receiver was further directed to pursue and preserve all of Elk's claims.

136.    Receivership law permits equity Receivers to clawback and demand turnover of funds improperly diverted from the entity now in Receivership so that the Receiver may achieve its court-mandated purpose of marshaling assets to distribute to Elk's claimants and creditors.

137.    The loan made by A Holdings, Bounty, and Renova to Ameritrans was not a loan to Elk.

138.    Elk was not a party or guarantor to the A Holdings Note or loan and had no obligation to pay the A Holdings Note.

139.    Elk did not receive consideration from A Holdings or Bounty or Renova.

140.    Elk did not receive any of the funds from the $1,500,000 loan to Ameritrans from A Holdings.

141.    The $1,500,000 short term loan from A Holdings to Ameritrans was used to pay Ameritrans expenses, to pay Ameritrans life insurance premiums, and to invest in non-SBIC assets, not eligible for SBIC financing through Elk, which is confirmed by section 4.1(l) of the A Holdings Note which limited the use of the loan by Ameritrans to Ameritrans transaction expenses and Ameritrans working capital purposes.

142.    A Holdings, Bounty and Renova knew or should have known through the terms of the A Holdings Note, the Stock Purchase Agreement, and Ameritrans's SEC filings including its 10-Q, 10-K and N-2 forms that Ameritrans did not have sufficient unencumbered funds to pay Ameritrans creditors, including the Defendants on behalf of the A Holdings Note.

143.    A Holdings, Bounty and Renova knew or should have known through the

terms of A Holdings Note, the Stock Purchase Agreement, and Ameritrans's SEC filings including its 10-Q, 10-K and N-2 forms that Elk's funds could only be used as specified by the Act and Regulations, Elk was capitally impaired, and Elk's funds could not be used to pay the Defendants on behalf of the A Holdings Note.

144.     Nevertheless the funds from Elk's sales of two portfolio concerns Affinity Group, Inc. and Miramax Film NY, LLC were not deposited with the Custodian in violation of the SBA Security Agreement and Custodian Agreement, SBA did not have notice and consequently, did not give the required written consent to the payment of the proceeds from the sale of Elk's assets to Ameritrans or to A Holdings, as set forth in paragraphs 63 through 73 and 100 through 107 which are re-alleged and reincorporated as though fully set forth in this cause of action.

145.     In addition to being a violation of the SBA Security Agreement, this transfer was in violation of 13 C.F.R. §107.885, which prohibits the disposition of assets to an Associate as that term is defined in 13 C.F.R. §107.50.

146.     On March 7, 2012, A Holdings received $1.42 million of funds from the proceeds of Elk's sales of two portfolio concerns Affinity Group, Inc. and Miramax Film NY, LLC, which funds belong to Elk as described at paragraphs 100 through 107, which are re-alleged and reincorporated as though fully set forth in this cause of action, which evidence that A Holdings received Elk's funds which are assets of the Receivership.

147.     A Holdings and Renova doing business as Columbus Nova share the same CEO, office and address.

148.     Upon information and belief, A Holdings was a special purpose entity 100% owned by defendant Bounty and created at the direction of Renova as a shell company for the

sole purpose, of providing the bridge loan to Ameritrans evidenced by the A Holdings Note.

149.    Upon information and belief, Elk's funds received by A Holdings, a shell company, were transferred to Defendant Renova as the affiliate, principal and/or real party in interest of A Holdings, and/or transferred to Bounty, A Holdings 100% owner, and evidencing that Renova and/or Bounty received Elk's funds which are assets of the Receivership.

150.    A Holdings, and upon information and belief Bounty and/or Renova benefited from receiving the $1.42 million of funds from the sales of Elk's assets to the detriment of Elk and its creditors, because on March 6, 2012, Ameritrans's total bank accounts balance was $13,961.13, and at the time of payment by Ameritrans to A Holdings on March 7, 2012, Ameritrans' records show that its total cash balance was comprised solely of the proceeds from the sales of Elk's assets.

151.    A Holdings, Bounty, and/or Columbus Nova should not be permitted to keep the $1.42 million of Elk's funds, as the funds belong to Elk, were improperly diverted from Elk when Elk was capitally impaired and insolvent and were improperly diverted prior to Elk's transfer to the Office of Liquidation due to Elk's condition of capital impairment, as defined at 13 C.F.R. §107.1830.

152.    An equity Receiver has the remedy of clawback to demand turnover of funds improperly diverted from Elk prior to the Receivership, as directed by the terms of the Receivership Order which direct the Receiver to marshal and liquidate Elk's assets and pursue and preserve all of Elk's claims.  The facts alleged in this cause of action show that the Defendants obtained the funds of Elk, which were improperly diverted from Elk when it was capitally impaired and insolvent, to the detriment of Elk, and that the Defendants knew or should have known that Ameritrans did not have sufficient unencumbered assets to pay the Defendants,

fulfilling the equities in support of clawback.  The Defendants should not be permitted to retain and/or are liable to pay to the Receiver for Elk for not less than the amount of $1.42 million improperly diverted from Elk to A Holdings, and upon information and belief to Bounty and/or Renova, plus applicable interest thereon from March 7, 2012, the date of the improper transfer to the Defendants.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST FOR FUNDS**
**RECEIVED BY A HOLDINGS, BOUNTY, AND RENOVA**

153.     Paragraphs 1 through 152 are re-alleged and reincorporated as though fully set forth herein.

154.     Specifically, those paragraphs numbered 24 through 107 are re-alleged and reincorporated as though fully set forth herein.

155.     Upon information and belief, A Holdings, Bounty, and/or Renova took custody of Elk's property under a circumstance that would render it inequitable for A Holdings, Bounty, and/or Renova to retain such property.

156.     The $1,500,000 short term loan from A Holdings to Ameritrans was used to pay Ameritrans expenses, to pay Ameritrans life insurance premiums, and to invest in non-SBIC assets with no relation to Elk, which is confirmed by section 4.1(l) of the A Holdings Note which limited the use of the loan by Ameritrans to Ameritrans transaction expenses and Ameritrans working capital purposes.

157.     Elk received no consideration from A Holdings Note and loan to Ameritrans.

158.     Elk had no obligation to pay Ameritrans' obligations to A Holdings, Bounty, and/or Renova.

159.     Elk did not receive any of the funds from the $1,500,000 loan to Ameritrans

from A Holdings.

160.    A Holdings, Bounty and Renova knew or should have known, through the terms of the A Holdings Note, the Stock Purchase Agreement, and Ameritrans's SEC filings, including its 10-Q, 10-K and N-2 forms, that Ameritrans did not have sufficient unencumbered funds to pay Ameritrans creditors, including the Defendants on behalf of the A Holdings Note.

161.    A Holdings, Bounty and Renova knew or should have known through the terms of the A Holdings Note, the Stock Purchase Agreement, and Ameritrans's SEC filings, including its 10-Q, 10-K and N-2 forms, that Elk's funds could only be used as specified by the Act and Regulations, Elk was capitally impaired, and Elk's funds could not be used to pay the Defendants on behalf of the A Holdings Note.

162.    Nevertheless the funds from Elk's sale of two portfolio concerns Affinity Group, Inc. and Miramax Film NY, LLC were not deposited with the Custodian in violation of the SBA Security Agreement and Custodian Agreement, SBA did not have notice and consequently, did not give the required written consent to the payment of the proceeds from the sale of Elk's assets to Ameritrans or to A Holdings, as set forth in paragraphs 64 through 73 and 100 through 107, which are re-alleged and reincorporated as though fully set forth in this cause of action.

163.    In addition to being a violation of the SBA Security Agreement, this transfer was in violation of 13 C.F.R. §107.885, which prohibits the disposition of assets to an Associate as that term is defined in 13 C.F.R. §107.50.

164.    On March 7, 2012, A Holdings, received $1.42 million of funds traced directly from the proceeds of Elk's sale of two portfolio concerns Affinity Group, Inc. and Miramax Film NY, LLC, which funds belong to Elk as described at paragraphs 100 through 107, which are re-

alleged and reincorporated as though fully set forth in this cause of action, and evidencing that A Holdings received funds belonging to the Plaintiff, and which evidence the elements of unjust enrichment that Defendants were enriched at Plaintiff's expense.

165.    A Holdings and Renova doing business as Columbus Nova share the same CEO, office and address.

166.    Upon information and belief, A Holdings was a special purpose entity 100% owned by defendant Bounty and created at the direction of Renova as a shell company for the sole purpose, of providing the bridge loan to Ameritrans evidenced by the A Holdings Note.

167.    Upon information and belief, Elk's funds received by A Holdings, a shell company, were transferred to Defendant Renova as the affiliate, principal and/or real party in interest of A Holdings and/or transferred to Bounty, A Holdings 100% owner, that Renova and/or Bounty received funds belonging to the Plaintiff, evidencing the elements of unjust enrichment that Defendants were enriched at Plaintiff's expense.

168.    A Holdings, and upon information and belief Bounty and/or Renova benefited from receiving the $1.42 million of funds from the sales of Elk's assets to the detriment of Elk and its creditors, because on March 6, 2012, Ameritrans's total bank accounts balance was $13,961.13, and at the time of payment by Ameritrans to A Holdings on March 7, 2012, Ameritrans' records show that its total cash balance was comprised solely of the proceeds from the sales of Elk's assets, evidencing the elements of unjust enrichment that Defendants were enriched at Plaintiff's expense.

169.    A Holdings, and upon information and belief, Bounty, and/or Renova should not be permitted to retain the $1.42 million of Elk's funds, as (a) the funds belong to Elk, (b) were improperly diverted from Elk when Elk was capitally impaired and insolvent and (c) were

improperly diverted after Elk had received notice from SBA of Elk's under the Regulations due to Elk's condition of capital impairment, as defined at 13 C.F.R. §107.1830, which evidence the element of unjust enrichment that under principles of equity and good conscience, the Defendants should not be permitted to keep Elk's money.

170.     The facts alleged in this cause of action show that A Holdings, and upon information and belief Bounty and/or Renova have been unjustly enriched by receiving $1.42 million from the sale of two of Elk's portfolio concerns, at the expenses of Elk which was capitally impaired and insolvent, when the Defendants knew or should have known Ameritrans did not have sufficient unencumbered funds to repay Defendants.  Thus, it is against equity and good conscience to permit the Defendants to retain the $1.42 million of Elk's funds, fulfilling the elements of unjust enrichment.  A Holdings, Bounty, and Renova should not be permitted to retain and/or are liable to turnover to the Receiver for Elk for not less than the amount of $1.42 million improperly diverted from Elk to the Defendants, plus interest, from March 7, 2012, the date of the improper transfer to the Defendants, and a constructive trust should be imposed on those funds for the benefit of the Receiver.

## **PRAYER FOR RELIEF**

WHEREFORE, the Receiver for Elk respectfully requests that this Court enter judgment against Defendants Ameritrans Holdings, LLC, Bounty Investments, LLC, Renova U.S. Management LLC f/k/a Sparrow Capital Holdings LLC d/b/a Columbus Nova, jointly and severally, and in favor of the Plaintiff Receiver for Elk, for $1.42 million plus all applicable interest thereon and for any such other relief as the Court deems just and proper.

Dated:  New York, New York
          March 3, 2020

Respectfully submitted,

U.S. SMALL BUSINESS ADMINISTRATION
Receiver for Elk Associates Funding Corp.

By: _____
      Arlene M. Embrey, Trial Attorney
      U.S. Small Business Administration
      409 Third Street, S.W., Seventh Floor
      Washington, D.C. 20416
      Telephone: (202) 205-6976
      Email: Arlene.embrey@sba.gov



GOTTESMAN, WOLGEL, FLYNN,
WEINBERG & LEE, P.C.

By: _____
      Steven Weinberg, Esq.
      11 Hanover Square, 4th Floor
      New York, N.Y. 10005
      Telephone: (212) 495-0100
      Email: sweinberg@gottesmanlaw.com

*Index No.*                *Year 20*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

U.S. SMALL BUSINESS ADMINISTRATION AS RECEIVER OF ELK,
ASSOCIATES FUNDING CORP.

Plaintiff,

- against -

AMERITRANS HOLDINGS LLC, BOUNTY INVESTMENTS, LLC, RENOVA
U.S. MANAGEMENT, LLC N/K/A SPARROW CAPITAL HOLDINGS, LLC,

Defendants.

**COPY**            Complaint

GOTTESMAN, WOLGEL, FLYNN, WEINBERG & LEE, P.C.
A Professional Corporation Incorporated in the State of New York

*Attorneys for*

U.S. SBA as Receiver of Elk Associates Funding Corp.

11 HANOVER SQUARE
NEW YORK, N.Y. 10005
TEL. NO. (212) 495-0100
FAX NO. (212) 480-9797

*Pursuant to 22 NYCRR 130-1.1-a, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, (1) the contentions contained in the annexed document are not frivolous and that (2) if the annexed document is an initiating pleading, (i) the matter was not obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are not participating in the matter or sharing in any fee earned therefrom and that (ii) if the matter involves potential claims for personal injury or wrongful death, the matter was not obtained in violation of 22 NYCRR 1200.41-a.*

*Dated:*..........................................      Signature ........................................................................

                           Print Signer's Name.................................................................

*Service of a copy of the within*                                 *is hereby admitted.*

*Dated:*

                               ..................................................................
                                 *Attorney(s) for*

*PLEASE TAKE NOTICE*

<span style="writing-mode: vertical-rl">Check Applicable Box</span>

☐ **NOTICE OF ENTRY**
*that the within is a (certified) true copy of a*
*entered in the office of the clerk of the within-named Court on*           *20*

☐ **NOTICE OF SETTLEMENT**
*that an Order of which the within is a true copy will be presented for settlement to the*
*Hon.*                        *, one of the judges of the within-named Court,*
*at*
*on*                *20*        *, at*           *M.*

*Dated:*

                 GOTTESMAN, WOLGEL, FLYNN, WEINBERG & LEE, P.C.
                 A Professional Corporation Incorporated in the State of New York

            *Attorneys for*

*To:*
                                 11 HANOVER SQUARE
                                 NEW YORK, N.Y. 10005
                                 TEL. NO. (212) 495-0100