UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
U.S. Small Business Administration, as
Receiver of ELK ASSOCIATES FUNDING
CORP.,

         Plaintiff,

 -against-

AMERITRANS HOLDINGS, LLC,
BOUNTY INVESTMENTS, LLC, and
RENOVA U.S. MANAGEMENT, LLC,

        Defendants.
-----------------------------------------------------------x

**REPORT AND
RECOMMENDATION**

20-CV-1166 (JS)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

 Presently before the Court, on referral from the Honorable Joanna Seybert for report and recommendation, is Defendants' Ameritrans Holdings, LLC ("Am. Holdings"), Bounty Investments, LLC ("Bounty"), and Renova U.S. Management, LLC ("Renova") (collectively, "Defendants") Motion to Dismiss the Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). *See* Defendants' Motion to Dismiss the Complaint ("Defendants' Motion" or "Def. Mot."), Docket Entry ("DE") [21]. By way of Complaint dated March 3, 2020, Plaintiff U.S. Small Business Administration, as Receiver for Elk Associates Funding Corp. ("Plaintiff" or the "Receiver") commenced this action against Defendants for: (1) money had and received; (2) equitable clawback; and (3) unjust enrichment and constructive trust for funds received by Defendants from Elk Associates Funding Corp. ("Elk"). *See* Complaint ("Compl."), DE [1]. For the reasons set forth herein, the Court respectfully recommends that Defendants' Motion be denied in its entirety.

## I.    BACKGROUND

Unless otherwise indicated, the facts set forth herein are taken from the Complaint, and are accepted as true for purposes of the instant Report and Recommendation.

### A.  Initial Relationship Between Elk, Ameritrans and SBA

Elk Associates Funding Corp. ("Elk") is a New York corporation that, on or about July 24, 1980, was licensed to do business as a Small Business Investment Company ("SBIC") pursuant to Section 301(d), and later Section 301(c) of the Small Business Administration Act (the "Act"). Compl. ¶¶ 3, 10. As an SBIC, Elk was regulated by, and received initial funding from, the U.S. Small Business Administration ("SBA"). *Id.* at ¶¶ 11-13. Ameritrans Capital Corporation ("Ameritrans"), a Delaware corporation, is Elk's parent company and sole shareholder. *Id.* at ¶ 3. Bounty is a Delaware limited liability company with its principal place of business in Delaware. *Id.* at ¶ 5. Renova is a Delaware liability company with its principal place of business in New York, and was doing business as "Columbus Nova" at all times during the events herein. *Id.* at ¶ 6. Am. Holdings is a Delaware limited liability company formed and completely owned by Bounty, managed by, and affiliated with Renova, and has an address in New York. *Id.* at ¶¶ 4, 38. Andrew Intrater ("Intrater") is the Chief Executive Officer ("CEO") of both Renova and Am. Holdings. *Id.* at ¶¶ 6, 36.

In connection with the SBA funding, Elk and SBA "entered into a security agreement on September 9, 1993 (the "SBA Security Agreement") pursuant to which

Elk granted a security interest to SBA in all of Elk's assets, including among other things, Elk's portfolio of loans receivable, together with any guarantees thereon, and all other obligations owing to Elk, to secure payment of debentures and any other indebtedness or liability to SBA, including future debentures which may be issued to or guaranteed by SBA." *Id.* at ¶ 14.  Also on September 9, 1993, Elk received funding from certain banks (the "Senior Lenders"), and Elk, the Senior Lenders and SBA "entered into an Intercreditor Agreement (the "Intercreditor Agreement"), which provide[d] that the security interest of SBA rank[ed] junior in priority to the security interests of the Senior Lenders." *Id.* at ¶ 15.

Elk, SBA and the Senior Lenders also entered into a Custodian Agreement (the "Custodian Agreement") with Israel Discount Bank ("IDB"), pursuant to which IDB "was appointed custodian to hold all of Elk's assets for the benefit of the Senior Lenders and SBA." *Id.*  Under the Custodian Agreement, if Elk intended "to sell all or a portion of [Elk's] interest in any note or other evidence of indebtedness," it was required to provide IDB with "written certification that the net proceeds from such sale [would] be utilized immediately to reduce [Elk's] Senior Indebtedness." *Id.* at ¶ 66.  If Elk did not, however, "intend to utilize the proceeds to repay the Senior Indebtedness," it was required to provide written notice to "the SBA, the [Senior Lenders] and the Custodian" of the amount that would not be used to pay back Elk's debt, and could only consummate a proposed transaction "[i]f the SBA and the Banks d[id] not object." *Id.*  Pursuant to both the SBA Security Agreement and the Intercreditor Agreement, Elk "agreed to limit the aggregate of its indebtedness based

on a computation of a borrowing base (the "Borrowing Base") each quarter…calculated to determine that the total amount of debt due on senior bank debt and SBA debentures d[id] not exceed approximately 80% of the value of performing loans and investments in Elk's portfolio." *Id.* at ¶¶ 63-64.

In 1998, SBA permitted Ameritrans to become Elk's sole shareholder, "based on certain conditions[,] including that Elk's assets could not be used to collateralize any indebtedness of Ameritrans." *Id.* at ¶ 16. Thereafter, Elk and Ameritrans had the same officers and directors and shared the same New York office space. *Id.* In both 1998 and 1999, Elk confirmed to SBA that it was aware that its assets could not "be used to collateralize any indebtedness of Ameritrans." *Id.* at ¶ 17.

In mid-2007, Elk received debenture funding from SBA in the amount of approximately $11.6 million which, on August 13, 2007, gave rise to the filing of "a form UCC-1 Financing Statement…in favor of SBA which was subject to the rights of Elk's Senior Lenders; however, between March 22, 2011 and March 24, 2011, Elk's Senior Lenders' UCC-1 Financing Statements were terminated, leaving only the Form UCC-1 Financing Statement in favor of SBA which was active to August 13, 2012." *Id.* at ¶¶ 18-19. By letter dated December 18, 2008, Elk requested an additional $15 million commitment from SBA. *Id.* at ¶ 19. In that letter, Elk certified that "the proceeds of the issuance and sale of the securities to be committed by SBA as requested herein will be used only for the purposes contemplated by the Act and the Regulations." *Id.* In September 2009, SBA approved an additional debenture

commitment of $9.175 million, which Elk took in one draw in December 2009. *Id.* at ¶ 20.

As an entity regulated by the Securities and Exchange Commission (the "SEC"), Ameritrans was "required to make certain filings with the SEC which are publicly available on the EDGAR website including 10-K, 10-Q, N-2, and Schedule 14A Form filings." *Id.* at ¶ 21. Ameritrans's SEC Form 10-K for the fiscal year ending June 30, 2010, stated that Ameritrans had not operated at a profit "in recent years" and that Ameritrans "anticipated incurring a loss in fiscal year 2011…." *Id.* Ameritrans "went on to report that it had a decline in revenue, down from $6.3 million in 2008 to $1.7 million in 2010." *Id.*

As of June 30, 2010, Elk was allegedly not in compliance with the Borrowing Base agreed upon under the SBA Security Agreement and the Intercreditor Agreement. *Id.* at ¶ 63. On or about July 13, 2010, SBA informed Elk that, "based on Elk's March 31, 2010 financial report submitted to SBA, Elk had a condition of capital impairment, as that term is defined at 13 C.F.R. § 107.1830" and that Elk needed to rectify the impairment immediately. *Id.* at ¶ 22. According to Plaintiff, the condition of capital impairment has not been cured to date, and "there remains approximately $19.5 million in unpaid and outstanding [funds] due from Elk to SBA." *Id.* at ¶ 23.

### B. **Short Term Loan From Am. Holdings**

On November 19, 2010, Renova, through Intrater, executed an agreement with Daroth Capital Advisors LLC ("Daroth"), in connection with "consideration of a

possible transaction…involving Ameritrans," to help raise capital for such a transaction. *Id.* at ¶ 24. According to Ameritrans's SEC Form Schedule 14A dated May 23, 2011, on November 19, 2010, "Daroth introduced [Ameritrans] to [Renova]. Shortly thereafter, [Ameritrans's] management met with representatives of [Renova] and its legal counsel at [Renova's] offices." *Id.* at ¶ 25. Between December 15 and December 30, 2010, Ameritrans and Renova "continued to negotiate a non-binding term sheet for a proposed investment in [Ameritrans]," during which Renova requested that Ameritrans "agree to an exclusivity period for [Renova to] complete due diligence and negotiate definitive documentation for its proposed investment" in Ameritrans, which Renova submitted on December 17, 2010. *Id.* at ¶ 26. That same day, Ameritrans informed Renova that Ameritrans "required a working capital investment and worked with [Renova] to negotiate a $5 million bridge loan." *Id.* at ¶ 27. Based on documents submitted by Elk to SBA for the period ending March 31, 2010, Elk was capitally impaired, and insolvent as of December 31, 2010. *Id.* at ¶ 28.

On January 4, 2011, Renova and Ameritrans "resumed discussions regarding a bridge loan, an exclusivity agreement[,] and a non-binding term sheet for a larger investment." *Id.* at ¶ 29. The January 18, 2011 minutes of a special meeting of Ameritrans's and Elk's Board of Directors set forth a discussion of the "anticipated Senior Note transaction" with one of Renova's affiliates and "proposed exclusivity agreement to be entered into" with Renova, where Renova would "purchase a minimum of $60 million in AMTC [Ameritrans] shares at $1.50 per share." *Id.* at ¶ 30. On January 19, 2011, Ameritrans entered into an exclusivity agreement with

Bounty, an affiliate of Renova, "and executed a bridge note in the principal amount of $1,500,000" (the "Am. Holdings Note") the next day. *Id.* at ¶¶ 31, 34. Elk "was not a party to, or guarantor of, the [Am. Holdings Note] and had no obligation to pay the A[m.] Holdings Note." *Id.* at ¶ 40. On February 28, 2011, "the exclusivity period with [Renova] was automatically extended to March 10, 2011, pursuant to the terms of the exclusivity agreement." *Id.* at ¶ 39. On March 23, 2011, Ameritrans's Board "held a discussion on the issues presented and the need for [Ameritrans], under current circumstances, to consummate an equity investment such as the proposed investment being negotiated with [Renova]." *Id.* at ¶ 72. Ameritrans's Board then "directed management to continue negotiating with [Renova] and to make efforts to resolve open issues." *Id.*

According to Ameritrans's Daily Bank Accounts Balance Report dated January 19, 2011, "Ameritrans's total bank accounts balance was overdrawn with aggregate bank accounts balances totaling negative $102,414.49, which increased to $1,397,585.61 on January 20, 2011," based on the receipt of the $1.5 million of funds from the Am. Holdings Note. *Id.* at ¶ 32. The Am. Holdings Note "was originally secured by a pledge of 100% of the issued and outstanding shares of the common stock of Elk owned by Ameritrans," but "was amended in May 2011 to include all personal property and other assets of Ameritrans and to exclude the common stock and all other equity interests of Elk, as disclosed in Ameritrans'[s] s 10-K for the period ending June 30, 2011," pursuant to SBIC regulations. *Id.* at ¶ 35.

### C. **Am. Holdings Note Terms and Referenced SEC Filings**

Paragraph 3.4 of the Am. Holdings Note prohibited Ameritrans or its subsidiaries from incurring additional "indebtedness for borrowed money" besides the amounts set forth in the Note and Schedule attached thereto.  *Id.* at ¶ 49.  The Schedule listed Ameritrans's indebtedness as:  (1) "$3.0 million principal amount of indebtedness under the Existing Promissory Notes"; (2) $21.175 million principal amount of indebtedness under of debentures issued to SBA"; and (3) $119,000 principal amount of indebtedness owed to Signature Bank."  *Id.* at ¶ 50.  Ameritrans also allegedly "had available $452,000 of credit lines from its banks, of which $0 was drawn down as of that date, subject to the statutory and regulatory limitations" imposed by SBA."  *Id.* at ¶ 51.

The Receiver alleges that Defendants were "on notice of Ameritrans's financial condition as contained in Ameritrans annual report Form 10-K and 10-Q," because paragraph 3.6 of the Am. Holdings Note states that the documents submitted by Ameritrans to the SEC "present fairly, in all material respects, [Ameritrans's] consolidated financial position…."  *Id.* at ¶¶ 45-46.  Paragraph 4.1 of the Am. Holdings Note allegedly put Defendants on notice that:  (i) "Elk was an SBIC governed by the rules and regulations of the Small Business Investment Act of 1958"; and (ii) Elk and SBA had agreed that "any proceeds be paid over to SBA unless prior approval was obtained by SBA for Elk to use the funds otherwise."  *Id.* at ¶¶ 54-57.

Paragraph 4.2 of the Am. Holdings Note prohibited Ameritrans and its subsidiaries, from the date of the Am. Holdings Note's issuance, "until all principal

and interest owing hereunder have been paid in full," from: (1) ceasing to "conduct or carry on the business of [Ameritrans] or its Subsidiaries substantially as now conducted or as proposed to be conducted or materially change any part of its business activities or take any action which would result in a Material Adverse Effect"; (2) effecting the "sale, transfer or license, in a single transaction or a series of transactions, of any material assets with a fair market value in excess of $500,000"; (3) repaying any amount of principal in respect of the Existing Promissory Notes; (4) "incur[ring] any Indebtedness for borrowed money in excess of $250,000"; or (5) "incur[ring] any Liens other than Permitted Liens." *Id.* at ¶ 69.

Paragraph 4.4(1) of the Am. Holdings Note required that proceeds of the associated loan be used solely: (i) to pay transaction expenses of Am. Holdings and Ameritrans; and (ii) "for general working capital purposes," as described above. *Id.* at ¶ 41. According to Plaintiff, however, Elk's cash receipts ledgers and bank accounts records indicate that "the proceeds of the $1,500,000 loan from [Am. Holdings] to Ameritrans were not paid to, deposited into any of Elk's accounts nor otherwise used for the benefit of Elk," but were instead used "for Ameritrans expenses, to pay Ameritrans life insurance premiums, and to purchase and/or maintain non-SBIC assets belonging to Ameritrans." *Id.* at ¶¶ 43-44.

In April 2011, Ameritrans and Am. Holdings amended the Am. Holdings Note to permit Ameritrans "to incur certain indebtedness," deleted section 4.2(g) of the Am. Holdings Note, and replaced the provision with "(g) incur any indebtedness for borrowed money in excess of $250,000 other than indebtedness incurred in the

9

ordinary course of business consistent with past practices for use as working capital in an aggregate principal amount not to exceed $500,000." *Id.* at ¶ 73.

## D. Ameritrans-Renova Stock Purchase Agreement

On April 11, 2011, at a meeting of Ameritrans's Board of Directors, a representative of the law firm Katten Muchin Rosenman LLP "summarized the principal terms of [a] proposed stock purchase agreement [(the "SPA")] with [Renova]," and answered questions regarding the SPA posed by Board members. *Id.* at ¶ 74. Ameritrans and Renova entered into the SPA the following day, with Renova "owning 91.4% of the issued and outstanding common stock of Ameritrans." *Id.* at ¶ 78. Pursuant to the SPA, the cash proceeds of the issuance and sale of the purchased stock were to be used: (a) to pay the fees and expenses Ameritrans and Renova, "in connection with the negotiation and execution of the SPA,"; (b) to repay the Am. Holdings Note; (c) for "general working capital"; and (d) "to fund an equity investment in Elk Associates Funding Corporation." *Id.* at ¶ 82. According to the Receiver, Ameritrans "periodically provided financial statements, workpapers and other agreements and documents important to its operations to Renova via emails," as required by the Am. Holdings Note and SPA. *Id.* at ¶ 81. Consummation of the SPA was subject to the SBA's approval "of the indirect change of control of [Elk]." *Id.* at ¶ 89.

On April 15, 2011, Renova "agreed to eliminate the Ameritrans stock pledge of Ameritrans stock ownership of Elk securing [the Am. Holdings Note] and replac[ed] the stock pledge with a negative pledge." *Id.* at ¶ 91. Between May and July 2011,

Ameritrans and Renova "communicated and jointly created PowerPoint presentations and participated in at least one site visit to SBA in Washington, DC to present the terms of the [SPA] to the SBA." *Id.* at ¶ 92. On December 22, 2011, SBA "denied Elk's proposal that Ameritrans complete the [SPA] because the transaction did not meet the regulatory requirements for change of control under the SBIC Regulations." *Id.* at ¶ 93.

On January 19, 2012, Paul Lipari ("Lipari"), a Renova partner, notified Ameritrans's and Elk's CEO, Michael Feinsod ("Feinsod"), that because SBA did not intend to approve the SPA, Renova was declaring Ameritrans in default of its obligations under the Am. Holdings Note. *Id.* at ¶ 94. The same day, Am. Holdings "delivered written notice signed by [Intrater] to Ameritrans that an event of default under the [Am. Holdings Note] had occurred and declared all amounts immediately due and payable." *Id.* at ¶ 95. According to Ameritrans's Daily Bank Accounts Balance Report dated January 20, 2012, Ameritrans's total bank accounts balance was $15,417.48. *Id.* at ¶ 96.

On February 23, 2012, Ameritrans director Ivan Wolpert sent an email to Lipari, Intrater and Feinsod, stating that Ameritrans would pay Renova "$1,420,000 on March 7th, in full satisfaction of all obligations between [Renova] and [Ameritrans]." *Id.* at ¶ 97. On February 24, 2012, "Elk was informed via telephone by SBA that Elk was being transferred to the Office of Liquidation due to Elk's condition of capital impairment." *Id.* at ¶ 98. SBA sent Elk a letter dated March 6, 2012, memorializing the February 24, 2012 phone call, and instructing Elk "to cure

its condition of Capital Impairment to SBA's satisfaction within 15 days from the date of this letter." *Id.*

### E. Defendants' Alleged Diversion of Funds from Elk

By email dated March 2, 2012, Ameritrans and Elk officer Silvia Mullens ("Mullens") "instructed Jefferies High Yield Trading, LLC, that approximately $2.7 million received from the sale of Elk's investments in two (2) portfolio concerns, Affinity Group, Inc. and Miramax Film NY, LLC, [was to] be wired to Elk's checking account at Signature Bank and not [IDB]." *Id.* at ¶ 100. According to Plaintiff, Ameritrans's March 6, 2012 Daily Bank Account Balances report shows that Ameritrans's total cash balance was $13,961.13. *Id.* at ¶ 101. On March 7, 2012, "$2.5 million was transferred from Elk's non-custodian account to Ameritrans's account," without "the required notice to SBA and [IDB] under the Custodian Agreement." *Id.* at ¶ 102.

By email dated March 7, 2012, Feinsod instructed Mullens and Dominic Granito, the Controller of Elk and Ameritrans, to prepare – and subsequently execute – a $1.42 million wire from Ameritrans to Am. Holdings. *Id.* at ¶ 103. The transfer allegedly occurred: (i) without notice to SBA or IDB; (ii) without written approval from SBA; and (iii) without deposit of the proceeds of the sales of Elk's portfolio assets into Elk's account with IDB. *Id.*

### F. Transfer of Elk into Receivership

On March 20, 2012, one day prior to the March 21, 2012 expiration of SBA's deadline to cure Elk's violation of capital impairment, Elk filed for an emergency

temporary restraining order against SBA in the United States District Court for District of Columbia to delay SBA's transfer of Elk to the Office of Liquidation. *Id.* at ¶ 108. After Elk failed to cure its condition of capital impairment, Elk was transferred to SBA's Office of Liquidation in April 2012. *Id.* at ¶ 109. By Order entered April 24, 2013 (the "Receivership Order"), Judge Seybert appointed the U.S. Small Business Administration as Receiver (the "Receiver") of Elk pursuant to 15 U.S.C. §687(c), and "entered judgment in favor of SBA for the amount of Debentures outstanding, which at the time totaled over $20 million." *Id.*

The Receiver was appointed "for the primary purpose of liquidating all of Elk's assets and satisfying the claims of creditors in the order of priority as determined by this Court." *Id.* at ¶ 111. Shortly after its appointment, the Receiver transferred the cash balance in Elk's account, totaling approximately $17,000, to the Receiver's trust account. *Id.* Ameritrans's SEC Form 10-K for the fiscal year ending June 30, 2012 states that Ameritrans had not operated at a profit "in recent years" and "anticipated incurring a loss in fiscal year 2013…." *Id.* at ¶ 112. Ameritrans reported "a decline in revenue from $6.3 million in 2008 to $2.1 million in 2012." *Id.* According to Plaintiff, "as evidenced by Elk's Board Minutes and Ameritrans's Form 10-K filings with the SEC in 2011," Ameritrans never had the funds to repay Elk or Defendants. *Id.* at ¶ 113. On October 5, 2016, Ameritrans filed for bankruptcy in the United States Bankruptcy Court for the District of Massachusetts. *Id.* at ¶ 114. On June 2, 2017, the Receiver filed an amended Proof of Claim in the amount of $14,271,038 in the Ameritrans bankruptcy matter. *Id.* Elk's SBA Form 468 for the period ended

13

December 31, 2011 indicates that Ameritrans owed Elk at least $5,124,413, and Ameritrans's Form 10-Q for the period ended December 31, 2011 states that Ameritrans's assets totaled less than $4 million. *Id.* at ¶ 115.

Based on these records, the Receiver alleges that Ameritrans "did not at any time have sufficient liquid or unencumbered funds or assets, to repay its debt to Elk and to Ameritrans['s] creditors, including the [Am. Holdings Note," but instead "used Elk's assets to repay Ameritrans's debts in violation of the SBIC Regulations and New York law to the detriment of Elk and its creditors." *Id.* The Receiver further alleges that Defendants "benefited from the assets of Elk without any consideration to Elk, to the detriment of Elk," and "were on notice that Elk had a continuing condition of capital impairment since March 31, 2010, and Ameritrans had existing debt of $5,124,413.00 as of December 31, 2011," and did not have the funds to pay Defendants. *Id.* at ¶¶ 116-117.

### G. Procedural History

Based on the above, Plaintiff commenced this action against Defendants on March 3, 2020. *See* Compl. The Complaint alleges that Defendants "received funds in excess of $1.42 million," which had been "improperly diverted to [Ameritrans] from the sale of Elk's assets and paid by Ameritrans" to Defendants. *See id.* at 1.

Through the Complaint, the Receiver seeks judgment against Defendants "jointly and severally, and in favor of [Plaintiff], for $1.42 million plus all applicable interest thereon and for any such other relief as the Court deems just and proper. *Id.* Defendants sought to file a pre-answer motion to dismiss for failure to state a claim

pursuant to Fed. R. Civ. P. 12(b)(6), and were permitted to do so by Judge Seybert. On October 2, 2020, Defendants filed Defendants' Motion, which the Receiver opposed on October 15, 2020. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Resp."), DE [22-2]. Judge Seybert referred Defendants' Motion to this Court for report and recommendation on May 5, 2021. *See* May 5, 2021 Electronic Order. For the reasons set forth below, the Court respectfully recommends that Defendants' Motion be denied in its entirety.

## II.    LEGAL STANDARD

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1940 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1960 (2007)). A claim is considered plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. But, a pleading "that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966).

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a court must 'accept all allegations in the complaint as true and draw all inferences in the non-

moving party's favor.'" *U.S. ex rel. Siegel v. Roche Diagnostics Corp.*, 988 F. Supp. 2d 341, 343 (E.D.N.Y. 2013) (quoting *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009)).  Nevertheless, "threadbare recitals of the elements of a cause of action" that are supported by "conclusory" statements and mere speculation are inadequate and subject to dismissal.  *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation and citation omitted); *see Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  "The court's consideration on a motion under Fed. R. Civ. P. 12(b)(6) is limited to the factual allegations in the complaint; documents incorporated by reference into the complaint; matters of which judicial notice may be taken; and documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit." *Messina v. Mazzeo*, 854 F. Supp. 116, 128 (E.D.N.Y. 1994) (citing *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *see also Burton v. Am. Fed'n of Gov't Employees (AFGE) 1988*, No. 11-cv-1416, 2012 WL 3580399, at *5 (E.D.N.Y. Aug. 17, 2012).

## III.   DISCUSSION

Through the Complaint, the Receiver alleges causes of action for:  (1) money had and received; (2) equitable clawback; and (3) unjust enrichment.  *See generally* Compl.  Applying the standards outlined above, and for the reasons set forth below, the Court respectfully recommends that Defendants' Motion be denied in its entirety.

### A. Money Had and Received

Initially, Defendants argue that Plaintiff fails to state a cause of action for money had and received because: (i) "Elk [lacked] a possessory interest in the funds Ameritrans used to pay Am. Holdings"; (ii) Elk has failed to allege "that any of the Defendants acted inequitably in receiving the money" from Ameritrans; and (iii) "every transfer at issue here occurred by written contract[, thus] vitiat[ing] the money had and received claim." Defendants' Memorandum of Law in Support of their Motion to Dismiss ("Def. Mem."), DE [21-1], at 8-12. The Receiver asserts that "[t]he Complaint alleges facts to support each element of the cause of action for money had and received against each of the Defendants." Pl. Resp. at 7-8.

"[T]he elements of a claim of money had and received are that '(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money.'" *Quintanilla v. WW Int'l, Inc.*, No. 20-cv-6261, 2021 WL 2077935, at *14 (S.D.N.Y. May 24, 2021) (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984)); *see also Bens BBQ, Inc. v. County of Suffolk*, No. 20-cv-3254, 2021 WL 1748480, at *4 (2d Cir. May 4, 2021) (quoting *Ferer*, 731 F.2d at 125) ("A party asserting a claim for 'money had and received' under New York law must show that 'under principles of equity and good conscience, defendant should not be permitted to keep the money.'"); *Moreno-Godoy v. Gallet Dreyer & Berkey, LLP*, No. 14-cv-7082, 2016 WL 5817063, at *4 (S.D.N.Y. Oct. 4, 2016); *Cohen v. BMW Investments L.P.*, 144 F. Supp. 3d 492, 501

(S.D.N.Y. 2015), *aff'd*, 668 Fed. App'x 373 (2d Cir. 2016) (quoting *Middle E. Banking Co. v. State St. Bank Int'l,* 821 F.2d 897, 906 (2d Cir. 1987)).

Like unjust enrichment, a claim for money had and received is a quasi-contract claim, which allows a plaintiff "to recover money which has come into the hands of the defendant impressed with a species of trust because under the circumstances it is against good conscience for the defendant to keep the money." *Cohen v. Dunne*, No. 15-cv-3155, 2017 WL 4516820, at *5 (S.D.N.Y. Sept. 27, 2017) (quoting *BMW Investments L.P.*, 144 F. Supp. 3d at 501). Such a remedy is typically available when money is "obtained from another, through the medium of oppression, imposition, extortion, or deceit, or by the commission of a trespass." *Panix Promotions, Ltd. v. Lewis*, No. 01-cv-2709, 2002 WL 122302, at *2 (S.D.N.Y. Jan. 22, 2002) (quoting *Miller v. Schloss*, 218 N.Y. 400, 408, 113 N.E. 337, 339 (1916)).

Applying these standards, the Court concludes that the Receiver has adequately pled the elements of its claim for money had and received and alleged facts that, when assumed as true for Report and Recommendation, establish that: (i) Defendants received money belonging to Elk; (ii) Defendants benefitted from the receipt of the money; and (iii) "under principles of equity and good conscience, [Defendants] should not be permitted to keep the money." *Quintanilla*, 2021 WL 2077935, at *14. In support of Elk's possessory interest claim, Plaintiff alleges that the March 7, 2012 wire of $1.42 million from Elk, to Ameritrans and then to Am. Holdings came directly from the March 2, 2012 sale of Elk's prior investments in

Affinity Group, Inc. and Miramax Film NY, LLC.  Compl. ¶¶ 100-103.  This fact, when coupled with the Am. Holdings Note's explicit prohibition of Ameritrans from using Elk's "common stock and all other equity interests" to repay Ameritrans's obligations under the Am. Holdings Note, establishes that Defendants could have known – and chose to ignore – the source of the funds used to repay Am. Holdings.  These facts also demonstrate that Elk did not, contrary to Defendants' claims, voluntarily relinquish its possessory interest in the funds that Ameritrans used to repay its obligation to Am. Holdings.

As Defendants do not dispute that they benefitted from the receipt of the money from Ameritrans, *see generally* Def. Mem., the Court next analyzes whether Plaintiff has sufficiently alleged that Defendants, under principles of equity and good conscience," should be required to forfeit the funds received from Ameritrans.  Again, the Receiver has alleged facts in the Complaint that militate against Defendants being permitted to keep the funds.  Specifically, Plaintiff alleges that the Am. Holdings Note put Defendants on notice that numerous statutes and contracts proscribed the use of Elk's assets to repay Ameritrans's obligations under the Am. Holdings Note, and that Defendants knew that Ameritrans lacked the funds to repay those obligations but still chose to accept the funds from Ameritrans.  *See* Compl. ¶¶ 22, 32, 46, 49-52, 80, 90.

In reaching this conclusion, the Court rejects Defendants' argument that Plaintiff has not proven its cause of action for money had and received, because such a remedy is only available "if one man has obtained money from another, through the

19

medium of oppression, imposition, extortion, or deceit, or by the commission of a trespass." *Panix*, 2002 WL 122302, at *2 (internal citations omitted).  Not only is Defendants' quoted language not an element of a money had and received claim, *see Quintanilla*, 2021 WL 2077935, at *14, but assuming the facts pled in the Complaint as true, the Receiver has established that Defendants knew Ameritrans was not permitted to use Elk's funds the repay its obligations under the Am. Holdings Note, but still accepted the funds.  Accordingly, the Court respectfully recommends that Defendants' Motion be denied as to Plaintiff's cause of action for money had and received.

### B. Equitable Clawback

Defendants next move to dismiss the Receiver's action for equitable clawback based on fraudulent conveyance because "neither New York nor federal law provide[s] a cause of action" for equitable clawback, and "[a] clawback is a remedy, not a cause of action."  Def. Mem. at 17.  Plaintiff counters that the Complaint properly "alleges facts to support the clawback cause of action," which the Receiver contends "is the same as one for fraudulent conveyance based on a receiver's equitable powers."  Pl. Resp. at 18.

It is well established that the primary responsibility of an insolvent corporation's receiver is to conserve and "marshal the assets" of the former corporation's estate, *see Esbitt v. Dutch-Am. Mercantile Corp.,* 335 F.2d 141, 143 (2d Cir. 1964), and that a receiver may utilize a clawback action – an action "designed to claw money back" into the receivership fund – to fulfill this responsibility.  *In re*

20

*Bernard L. Madoff Inv. Secs. LLC*, No. 16-cv-2792, 2016 WL 3892765, at *3-4 (S.D.N.Y. Jul. 14, 2016); *see also Texas & P. Ry. Co. v. Pottorff*. 291 U.S. 245, 261, 54 S. Ct. 416, 420 (1934) ("It is the duty of the receiver of an insolvent corporation to take steps to set aside transactions which fraudulently or illegally reduce the assets available for the general creditors, even though the corporation itself was not in a position to do so.").  In the Second Circuit, "when transfers are made by a corporation that is dominated by the wrongdoer, a receiver appointed to recover assets for the receivership entity…has standing to bring claims on the corporation's behalf" to recover the fraudulently transferred funds.  *Carney v. Montes*, No. 3:12-cv-00183, 2014 WL 671263, at *9 (D. Conn. Feb. 21, 2014) (citing *Eberhard v. Marcu,* 530 F.3d 122 (2d Cir. 2008)); *see also Friedman v. Wahrsager,* 848 F. Supp. 2d 278, 289-92 (E.D.N.Y. 2012).  A receiver may utilize a clawback action to seek the return of funds involved in allegedly fraudulent or improper transactions.  *See In re Dewey & LeBoeuf LLP*, No. 12-cv-12321, 2014 WL 4746209, at *11 (Bankr. S.D.N.Y. Sept. 23, 2014).

To state a claim for constructive fraudulent conveyance[1] under New York law, a plaintiff must plead that the transfer was made without fair consideration and that "one of the following conditions is met:  (i) the transferor is insolvent or will be rendered insolvent by the transfer in question; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital; or (iii) the transferor believes that it will

---

[1] While Plaintiff does not specify in the Complaint, the Court treats the Receiver's clawback claim as one based on constructive fraudulent conveyance, consistent with the cases cited by the parties in their motion papers. *See generally* Def. Mem.; Pl. Resp.

incur debt beyond its ability to pay." *In re Nine W. LBO Sec. Litig.*, No. 20-md-2941, 2020 WL 7090277, at *18 (S.D.N.Y. Dec. 4, 2020) (quoting *In re Sharp Inter. Corp.*, 403 F.3d 43, 44 (2d Cir. 2005); New York Debtor and Creditor Law ("DCL") §§ 273-75; *see also In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 443 (S.D.N.Y. 2019); *839 Cliffside Ave. LLC v. Deutsche Bank Natl. Tr. Co. for First Franklin Mtge. Loan Tr. 2006-FF3 Mtge. Pass-Through Certificates, Series 2006-FF3*, No. 15-cv-4516, 2018 WL 4608198, at *5 (E.D.N.Y. Sept. 25, 2018); *In re M. Fabrikant & Sons, Inc.*, 480 BR 480, 486 (S.D.N.Y. 2012), *aff'd*, 541 Fed. App'x 55 (2d Cir. 2013); *Mills v. Everest Reinsurance Co.,* 410 F. Supp. 2d 243, 254 (S.D.N.Y. 2006) (finding that courts evaluating claims under the DCL §§ 273-275 "do not consider the actual intent of the transferor," and only apply the enumerated elements to potentially fraudulent conveyances); *In re Sharp Intern. Corp.*, 403 F.3d 43, 53-54 (2d Cir. 2005).

Additionally, because Plaintiff's fraudulent conveyance and clawback claim "implicates constructive fraud, as opposed to fraudulent intent, the heightened pleading standard embodied in Fed. R. Civ. P. 9(b) does not apply." *Friedman v. Wahrsager*, 848 F. Supp. 2d 278, 291-92 (E.D.N.Y. 2012); *see also Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co.,* 375 F. Supp. 2d 257, 268 (S.D.N.Y. 2005) (citing *Feist v. Druckerman,* 70 F.2d 333, 334 (2d Cir. 1934)); *Englander Capital Corp v. Zises*, No. 156927/12, 2013 WL 6043722, at *3 (1st Dep't 2013) ("Under New York law, certain transactions are deemed to operate as if they were fraudulent conveyances. In such circumstances, there is no requirement to show an intent to defraud.").

Applying these standards, the Court finds that the Receiver has pled facts to support its position that, as Elk's Receiver, it is "permitted to seek the turnover of the funds, from the unauthorized and prohibited transfer of Elk's assets as alleged in the Complaint to Defendants, and in equity the Defendants should not be permitted to keep Elk's funds." Pl. Resp. at 19.  Namely, Plaintiff asserts that:  (i) Elk has been insolvent since December 31, 2010; (ii) Elk was not a party to, or guarantor of, the Am. Holdings Note and had no obligation to pay the Am. Holdings Note; (iii) Elk did not receive any of the funds from the January 20, 2011 loan from Am. Holdings to Ameritrans; (iv) the funds from this loan were used to pay Ameritrans's expenses, life insurance premiums and to invest in non-SBIC assets, which were not eligible for financing through Elk; (v) Ameritrans used funds from the sale of two of Elk's assets to repay its obligations to Am. Holdings, without notifying SBA; and (vi) Defendants knew that Elk's funds could not be used to repay Defendants under the Am. Holdings Note but accepted the funds, nonetheless.  Compl. ¶¶ 28, 138-144.

Accordingly, the Court finds that the Receiver has established its standing to pursue this cause of action and sufficient facts to survive a motion to dismiss on this claim, and respectfully recommends that Defendants' Motion be denied as to Plaintiff's cause of action for equitable clawback based on fraudulent conveyance.

### C. Unjust Enrichment and Constructive Trust

Defendants similarly move to dismiss the Receiver's unjust enrichment and constructive trust claim because Am. Holdings and Ameritrans entered into the Am. Holdings Note, meaning that Defendants "could not have been unjustly enriched at

Elk's expense by receiving repayment for the amount of money Am. Holdings loaned" to Ameritrans.  *See* Def. Mem. at 13-17.  Plaintiff counters that Elk was not a party to the Am. Holdings Note, and "[t]he Complaint alleges facts to support each element of the cause of action for unjust enrichment and constructive trust for funds received by [Defendants]."  Pl. Resp. at 7-8.

Under New York law, the elements of an unjust enrichment claim are:  "(1) the other party was enriched, (2) at the other party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."  *BMW Investments L.P.*, 144 F. Supp. 3d at 500 (quoting *Georgia Malone & Co. v. Rieder,* 19 N.Y.3d 511, 516, 950 N.Y.S.2d 333, 336 (2012)).

Likewise, a claim for constructive trust under New York law requires a plaintiff to show:   "(1) a confidential or fiduciary relationship,   (2) a promise, (3) a transfer in reliance upon the promise, and (4) unjust enrichment."  *JPMorgan Chase Bank, N.A. v Roseman*, 137 A.D.3d 1222, 1223, 29 N.Y.S.3d 380, 382 (2d Dep't 2016) (citing *Sharp v. Kosmalski,* 40 N.Y.2d 119, 121, 386 N.Y.S.2d 72, 74-5 (1976)).

Claims of unjust enrichment and constructive trust are equitable in nature and generally not permitted if a legal remedy is available.  *See Speedfit LLC v. Chapco Inc.*, 15-cv-1323, 2016 WL 5793738, at *10 (E.D.N.Y. Jun. 29, 2016), *report and recommendation adopted,* 15-cv-1323, 2016 WL 5678812 (E.D.N.Y. Sept. 30, 2016) (citing *Int'l Equity Invs., Inc. v. Opp. Equity Partners Ltd.*, 472 F. Supp. 2d 544, 555 (S.D.N.Y. 2007)) ("[T]he existence of an adequate legal remedy precludes a remedy for unjust enrichment."); *In re First Cent. Fin. Corp.*, 377 F.3d 209, 215 (2d

Cir. 2004) ("With respect to constructive trusts specifically, New York courts have clarified that '[a]s an equitable remedy, a constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate.'") (quoting *Bertoni v. Catucci,* 117 A.D.2d 892, 895, 498 N.Y.S.2d 902, 905 (1986)).   Such claims are "precluded by the existence of an express written agreement governing the subject matter at issue." *See Boccardi Capital Sys., Inc. v. D.E. Shaw Laminar Portfolios, LLC*, 355 Fed. App'x 516, 519 (2d Cir. 2009); *Abraham v. Am. Home Mortgage Servicing, Inc.*, 947 F. Supp. 2d 222, 235 (E.D.N.Y. 2013) ("It is well established that the existence of a contract precludes a claim for a constructive trust."). Notwithstanding, where no contract exists between the parties, or where the existence or validity of a contract is in dispute, a party is permitted to assert equitable claims as alternative theories of liability. *See Fishman v. Phila. Fin. Life Assur. Co.*, No. 11-cv-1283, 2016 WL 2347921, at *13 (S.D.N.Y. May 3, 2016) (citing *New Paradigm Software Corp. v. New Era of Networks, Inc.*, 107 F. Supp. 2d 325, 329 (S.D.N.Y. 2000)).  "When considering an unjust enrichment claim, a court's 'essential inquiry' is one of 'equity and good conscience.'" *Marini v. Adamo*, 12 F. Supp. 3d 549, 552 (E.D.N.Y. 2014), *aff'd,* 644 Fed. App'x 33 (2d Cir. 2016) (quoting *Paramount Film Distrib. Corp. v. State of New York,* 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 393 (1972)).

Applying these standards, the Court again concludes that the Receiver has properly articulated facts to satisfy the elements of its unjust enrichment claim.  At the outset, the Court finds that Plaintiff's claims are neither barred by the Am. Holdings Note, nor any contract that may have existed between Ameritrans and any

individual Defendant, because Elk was not a party to any of those agreements. *See* Compl. ¶ 40; *see also U.S. East Telecommunications Inc. v. U.S. West Communications Services, Inc.*, 38 F.3d 1289, 1296-99 (2d Cir. 1994) (affirming an award of damages in favor of a subcontractor against a general contractor on a claim of unjust enrichment, when the general contractor had a contract with the subcontractor's employer, but not the subcontractor); *see also Fed. Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, No. 04-cv-4971, 2006 WL 2802092, at *6 (E.D.N.Y. Sept. 28, 2006)*; Capital Distributions Services, Ltd. v. Ducor Exp. Airlines, Inc.*, 440 F. Supp. 2d 195, 208 (E.D.N.Y. 2006). Further, as discussed above, the Receiver has pled facts that plausibly establish that Elk did not automatically relinquish its possessory interest in the funds transferred to Defendants by Ameritrans, because of the contractual prohibitions against Ameritrans's use of those funds. *See* Compl. ¶¶ 22, 32, 46, 49-52, 80, 90; *see also Nat'l Westminster Bank PLC v. Grant Prideco, Inc.*, 261 F. Supp. 2d 265, 275 (S.D.N.Y. 2003).

Here, Defendants do not deny receiving the $1.42 million dollars allegedly diverted from Elk, but argue that because the directors and officers of Elk and Ameritrans diverted the funds from Elk, and Defendants did not specifically act "inequitably," they may keep the funds. *See generally* Def. Mem. Defendants are mistaken, however, because the Receiver does not need to prove, at this juncture, that Defendants acted inequitably in order to sustain a claim for unjust enrichment. *See T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, No. 10-cv-2843, 2010 WL 4038826, at *4-7 (E.D.N.Y. Oct. 14, 2010) (holding that where the allegations support a claim

that a party, "in equity and good conscience, should return the funds that were removed from [another party's] possession through fraud," the party resisting repayment burden bears the burden of proof). As Plaintiff has sufficiently alleged facts to support its position that Defendants should return the money received from Ameritrans, the burden of proof as to why such funds should not be returned shifts to Defendants. As a result, the Court concludes that dismissal of this claim would be improper at this juncture because Defendants have not attempted to satisfy this burden, let alone proven that this particular cause of action should be dismissed. Accordingly, the Court respectfully recommends that Defendants' Motion be denied as to Plaintiff's cause of action for unjust enrichment and constructive trust.

## IV.    CONCLUSION

For the reasons set forth above, the Court respectfully recommends that Defendants' Motion be denied in its entirety.

## V.    OBJECTIONS

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, 05-cv-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:    Central Islip, New York
          June 15, 2021       /s/ Steven I. Locke
                                      STEVEN I. LOCKE
                                      United States Magistrate Judge